IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESTPORT INSURANCE CORPORATION, | : : | |
| Plaintiff, | : | No.  4:07-CV-0516 |
| | : | |
| v. | : | |
| | : | Judge John E. Jones III |
| HANFT & KNIGHT, P.C., *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

December 10, 2007

Before the Court are cross-motions for summary judgment filed by Plaintiff Westport Insurance Corporation ("Plaintiff" or "Westport") and Defendants Raymond A. Diehl and Genevieve A. Diehl ("Defendants" or "the Diehls").  These motions have been fully briefed, and the Court has heard oral argument on the issues raised therein.  For the reasons set forth below, the Court will grant Westport's motion (Doc. 50) and deny the Diehls' motion (Doc. 55).

## I.    BACKGROUND

This is a declaratory judgment action regarding professional liability insurance.  The underlying facts reveal the tragic circumstances that resulted from a lawyer's double life.  Westport seeks a declaration that it owes no duty to defend or indemnify the Estate of Michael J. Hanft and Hanft & Knight, P.C., who are

1

defendants in an action filed by the Diehls in the Cumberland County Court of

Common Pleas.  The Diehls oppose Westport's declaration and also seek an

affirmative declaration of coverage for the underlying suit.  Westport is currently

defending the underlying action under a reservation of rights.  The following facts

are derived from the operable underlying complaint and the insurance policy at

issue, and are undisputed.[1]

## A.    The Underlying Action

The Diehls filed the underlying complaint on September 8, 2004 against

Hanft & Knight and Susan Hanft, as representative of Michael Hanft's estate.[2]

The operable complaint in the underlying action is the Third Amended Complaint.

(*See* Westport Ex. E, Doc. 50-6.)  In the underlying complaint, the Diehls make

the following allegations.

---

[1] The parties disagree as to whether the Court may consider evidence beyond the underlying complaint and the policy in determining Westport's duties to defend and indemnify. Pennsylvania law is clear that in determining an insurer's duty to defend, a court may consider only the allegations of the underlying complaint. *Kvaerner Metals Div. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006).  However, "[u]nlike the duty to defend, the duty to indemnify cannot be determined merely on the basis of whether the factual allegations of the complaint potentially state a claim against the insured.  Rather, there must be a determination that the insurer's policy actually covers a claimed incident." *Am. States Ins. Co. v. State Auto Ins. Co.*, 721 A.2d 56, 63 (Pa. Super. Ct.1998).  Because the Court finds that Westport has no duty to defend based on the policy terms and the allegations of the underlying complaint, the Court limits its consideration to the policy and the four corners of the underlying complaint.  *See Kvaerner*, 908 A.2d at 896 n.7 (a finding that there is no duty to defend precludes a duty to indemnify).

[2] The Diehls also named Susan Hanft in her individual capacity, but she has since been dismissed as a defendant in that capacity by stipulation of the parties to the underlying action.

The Diehls engaged Michael Hanft as their attorney sometime prior to 1997 or 1998.  (Third Amend. Compl. ["TAC"] ¶ 7.)  Beginning in 1997, Hanft frequently "took unfair advantage of Mr. and Mrs. Diehl by borrowing large sums of money from them, often on an unsecured basis and always on terms unfavorable to the Diehls."  (TAC ¶ 10.)  In making these loans, the Diehls relied on Hanft's status as a professional and their trust in him as their attorney.  (TAC ¶ 11.)

Beginning in 1997, Hanft borrowed money from the Diehls, purportedly for a "construction project" which would generate sufficient returns to enable Hanft to timely repay the Diehls with interest.  (TAC ¶¶ 10, 13.)  The Diehls relied on Hanft's representation regarding the "construction project" in lending this money. (TAC ¶ 14.)

On November 13, 1997, Hanft also borrowed $86,000 from the Diehls, purportedly to purchase property located at 310 Fairview Street, South Middleton Township, Cumberland County.  (TAC ¶¶ 27, 64.)  To secure this loan, Hanft gave the Diehls a mortgage on the 310 Fairview Street property, although he never provided the Diehls a copy of the mortgage note.  (TAC ¶¶ 66-67, Ex. C.)  Hanft made payments on this loan, but failed to pay the Diehls $34,745.48 in interest. (TAC ¶¶ 27, 70-72.)

3

On May 3, 1999, Hanft borrowed $65,000 from the Diehls, purportedly to purchase property located at 308 Fairview Street, South Middleton Township, Cumberland County.  (TAC ¶ 52.)  This loan was an oral agreement; although the Diehls requested a note and mortgage from Hanft, he failed to provide them. (TAC ¶ 54.)  Hanft repaid the principal on this loan in two installments on October 11, 2002 and February 18, 2004, and made one payment of interest on July 2, 1999.  (TAC ¶¶ 56-57.)  However, Hanft never paid $22,012.33 in remaining interest due on the loan.  (TAC ¶¶ 53, 59-62.)

By August 2000, Hanft had borrowed more than $500,000 from the Diehls for the "construction project," and continued to borrow more, while making only a single payment of $10,000 in August 2001.  (TAC ¶ 17.)  By January 2003, Hanft owed the Diehls $784,742.07 in principal and interest.  (TAC ¶ 18.)  In January 2003, acting as borrower and attorney for the lenders, Hanft prepared a promissory note to evidence this debt.  (TAC ¶¶ 19, 21, Ex. A.)  The note, signed by Hanft and his wife, required the borrowers to "attempt" to make monthly payments.  (TAC ¶¶ 20, 21.)  The borrowers made only one payment of $2,396.18 in March 2004. (TAC ¶ 24.)  The Diehls later learned that Hanft's representations regarding the "construction project" were false; there was no project, and Hanft had used the money to gamble at casinos and satisfy gambling debts.  (TAC ¶¶ 15-16.)

4

On January 1, 2002, Hanft and Gregory H. Knight, Esq. formed the law firm Hanft & Knight, P.C., the party to this action. (TAC ¶¶ 4, 6, 34.) Hanft was the 75% majority shareholder of the firm. (TAC ¶ 31.) Hanft committed suicide on August 11, 2004. (TAC ¶ 3.)

In the underlying complaint, the Diehls assert four causes of action against Hanft's estate. First, the Diehls seek rescission of the 2003 promissory note. (TAC, Count I.) The Diehls allege that they were "induced to loan the money and accept the 2003 Note by [Hanft's] fraudulent representations" and Hanft's abuse of his position as their attorney. (TAC ¶ 39.) The Diehls further allege that they received nothing of value for the promissory note, "which [Hanft] never intended to repay or, in the alternative, believed he could repay only because of a [sic] unreasonable disregard for the truth that was so reckless as to amount to conscious deception." (TAC ¶ 40.) The Diehls demand "the return of all unpaid funds borrowed by [Hanft] under false pretenses," which totals $614,735.20 in principal plus interest of $275,184.79. In the alternative, the Diehls assert a cause of action for breach of the 2003 promissory note, demanding damages of principal and interest totaling $909,962.04. (TAC, Count II.) The Diehls also assert causes of action for breach of contract in regard to the 308 and 310 Fairview Street loans, seeking the unpaid interest on those loans. (TAC, Counts III and IV.)

The Diehls also assert three causes of action against Hanft & Knight.  The Diehls first allege that Hanft & Knight breached its professional duty of care both through the actions of its managing partner Hanft, and by failing to adequately supervise Hanft.  (TAC, Count V.)  The Diehls also allege that Hanft & Knight's "acts and omissions" breached its fiduciary duty to the Diehls.  (TAC, Count VI.)  Finally, the Diehls allege that Hanft & Knight, acting through Hanft, violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law.  (TAC, Count VII.)

### B.      The Westport Policy

Westport issued policy number PLL-351215-1 for the policy period of December 31, 2003 to December 31, 2004.  (Westport Ex. L, Doc. 50-13 at 14.)[3] The named insured is Hanft & Knight, P.C.  The policy defines an "insured" to include "any lawyer who is a past or present partner, officer, director, stockholder, shareholder, employee or 'of counsel' of the Named Insured, but only as respects legal services rendered on behalf of the named insured."  (*Id.* at 30.)  The policy also defines an "insured" to include "the heirs, executors, administrators, and legal representatives of any Insured, but only in their capacity as such in the event of

---

[3] Westport's policy, like most insurance policies, is not consecutively paginated. Citations to specific policy pages are to the CM/ECF page numbers of Document 50-13.

any Insured's death ... and only for Claims based on legal services rendered prior to such Insured's death." (*Id.*)

The policy is a claims made professional liability policy which provides $1,000,000 of per claim and $2,000,000 aggregate coverage for "lawyers professional liability." (*Id.* at 14.) Insuring Agreement I.A of the Lawyers Professional Liability coverage part obligates Westport to:

> pay on behalf of any Insured all Loss in excess of the deductible which any Insured becomes legally obligated to pay as a result of Claims first made against any Insured during the Policy Period ... by reason of any Wrongful Act occurring on or after the Retroactive Date, if any.

(*Id.* at 26.) "Loss" is defined as "the monetary and compensatory portion of any judgment, award or settlement" but does not include "civil or criminal fines, penalties, fees or sanctions" or "punitive or exemplary damages, including the multiplied portion any multiple damages." (*Id.* at 31.) "Claim" means "a demand made upon any Insured for Loss ... including, but not limited to, service of suit...." (*Id.* at 23.) "Wrongful Act" means "any act, error, omission, circumstances, Personal Injury, or breach of duty in the rendition of legal services for others, either for a fee or pro bono in the Insured's capacity as a lawyer...." (*Id.* at 32.)

The professional liability coverage part also includes a supplemental defense provision, which states that Westport has "the right and duty to select

counsel ... to defend any Claim for Loss against any Insured covered by Insuring Agreement I.A., even if such Claim is groundless, false or fraudulent." (*Id.* at 27.)

The policy also contains numerous exclusions, which Westport argues apply to preclude coverage in this case. These exclusions will be discussed in turn below.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson*, 477 U.S. at 248-49.

In opposing summary judgment, the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial."  *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the underlying facts and all reasonable inferences therefrom must be viewed in the light most favorable to the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact-finder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment."  *Anderson*, 477 U.S. 242, 247-48 (1986).

9

Where federal court jurisdiction is based on diversity of citizenship, as it is here, a court determines which state's substantive law governs by applying the choice-of-law rules of the jurisdiction in which the district court sits, in this case, Pennsylvania. *Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)). There is some disagreement among Pennsylvania decisions and federal decisions applying Pennsylvania law as to which choice of law rule governs a contract dispute. *Budtel Assoc., LP v. Continental Cas. Co.*, 915 A.2d 640, 643-44 (Pa. Super. Ct. 2006) (collecting cases). In this case, however, the parties have relied principally on Pennsylvania law in their pleadings and seem to agree that Pennsylvania law governs the insurance contract at issue. Accordingly, to the extent that the law of a state other than Pennsylvania could control the resolution of these motions, the issue has been waived by the parties. *See Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1005 n. 1 (3d Cir. 1980). Pennsylvania law shall apply.

In applying Pennsylvania law and in the absence of controlling authority from the Supreme Court of Pennsylvania, this Court must predict how the Supreme Court of Pennsylvania would resolve the questions posed in this case. *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir.

2006).   These questions will be described in detail in the sections that follow.

Though not controlling, decisions from Pennsylvania's lower appellate courts are

considered predictive, and in the absence of an indication otherwise, shall be

accorded significant weight.  *Id.*

## III.  DISCUSSION

Westport argues that numerous policy exclusions, as well as Pennsylvania

public policy, bar coverage in this case, and that it therefore has no duty to defend

or indemnify Hanft's estate or Hanft & Knight.  The Diehls argue that these

exclusions are inapplicable and ask for an affirmative declaration of coverage.

### A.     Rules of Policy Interpretation

The interpretation of an insurance policy is a question of law for the court.

*Kvaerner*, 908 A.2d at 897.  The court's primary goal in interpreting a policy is to

ascertain the parties' intentions as manifested by the policy's terms.  *Id.*   When

the language of the policy is clear and unambiguous, the court must give effect to

that language.  *Id.*   When a provision in the policy is ambiguous, "the policy is to

be construed in favor of the insured to further the contract's prime purpose of

indemnification and against the insurer, as the insurer drafts the policy, and

controls coverage."  *Id.*   "Contractual language is ambiguous if it is reasonably

susceptible of different constructions and capable of being understood in more

11

than one sense." *Prudential Prop. & Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174

(Pa. 2006). "A court's first step in a declaratory judgment action concerning

insurance coverage is to determine the scope of the policy's coverage." *Gen.*

*Accident Ins. Co. v. Allen*, 692 A.2d 1089, 1095 (1997) (citing *Lucker Mfg. v.*

*Home Ins. Co.*, 23 F.3d 808 (3d Cir. 1994)). "After determining the scope of

coverage, the court must examine the complaint in the underlying action to

ascertain if it triggers coverage." *Id.*

An insurer's duty to defend is separate from and broader than its duty to

indemnify. *Kvaerner*, 908 A.2d at 896 n.7. "In purchasing insurance, the

[insured] purchased not only the insurer's duty to indemnify when claims which

fall within the policy's coverage are successful, but also protection against those

groundless, false or fraudulent claims regardless of the insurer's ultimate liability

to pay." *D'Auria v. Zurich Ins. Co.*, 507 A.2d 857, 859 (Pa. Super. Ct. 1986). The

insurer must defend all claims potentially covered by the policy. *Southcentral*

*Employment Corp. v. Birmingham Fire Ins. Co.*, 926 A.2d 977, 983 (Pa. Super. Ct.

2007). Thus, [i]f the complaint against the insured avers facts that would support

a recovery covered by the policy, then coverage is triggered and the insurer has a

duty to defend." *Allen*, 692 A.2d at 1095. "[T]he particular cause of action that a

complainant pleads is not determinative of whether coverage has been triggered.

Instead it is necessary to look at the factual allegations contained in the complaint." *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). However, "the insurer's duty to defend is limited to only those claims covered by the policy." *Allen*, 692 A.2d at 1094.  Therefore, "[t]o decide whether a duty to defend exists, the court must compare the allegations in the complaint with the provisions of the insurance contract and determine whether, if the complaint allegations are proven, the insurer would have a duty to indemnify the insured." *Bombar v. W. Am. Ins. Co.*, 932 A.2d 78, 87 (Pa. Super. Ct. 2007).  The duty to defend remains with the insurer until it is clear that the underlying complaint is not within the scope of coverage.  *Allen*, 692 A.2d at 1095.

"Unlike the duty to defend, the duty to indemnify cannot be determined merely on the basis of whether the factual allegations of the complaint potentially state a claim against the insured.  Rather, there must be a determination that the insurer's policy actually covers a claimed incident." *Am. States Ins. Co.*, 721 A.2d 56, 63 (Pa. Super. Ct. 1998).  Because the duty to defend is broader than the duty to indemnify, a finding that there is no duty to defend precludes a duty to indemnify.  *Kvaerner*, 908 A.2d at 896 n.7.

The insured has the initial burden of establishing coverage under an insurance policy.  *Butterfeld v. Giuntoli*, 670 A.2d 646, 651-52 (Pa. Super. Ct.

13

1995).  If coverage is established, the insurer then bears the burden of proving an

exclusion applies.  "Where an insurer relies on a policy exclusion as the basis for

its denial of coverage and refusal to defend, the insurer has asserted an affirmative

defense and, accordingly, bears the burden of proving such a defense." *Madison*

*Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999).

### B.   Whether the Underlying Complaint Is Within the Scope of Coverage

The first step in a declaratory judgment action involving an insurance policy

is to determine the policy's scope of coverage and whether the underlying

complaint falls within that scope.  *Allen*, 692 A.2d at 1095.  Applying that step to

this case, we find that the Diehls' underlying complaint falls within the scope of

the Westport policy.

The policy requires Westport "to pay on behalf of any Insured all Loss ...

which any Insured becomes legally obligated to pay as a result of Claims first

made against any Insured during the Policy Period ... by reason of any Wrongful

Act...."  Hanft & Knight is the named insured.  Hanft is also an "insured" because

he was a "lawyer who is a past or present partner, officer, director, stockholder,

shareholder, employee or 'of counsel' of the Named Insured."  The underlying

complaint is clearly a "claim," and was made and reported within the policy

14

period.  At least for the purposes of these cross-motions for summary judgment,

Westport concedes that the underlying complaint alleges a "wrongful act" that

arose from the rendition of legal services.  (*See* Westport Opp., Doc. 63, at 1-2, 4;

Westport Reply, Doc 68, at 1.)

The parties dispute, however, whether the underlying claims come within

the insuring agreements definition of "loss."  The policy defines "loss" as "the

monetary and compensatory portion of any judgment, award or settlement" but

excludes "(1) civil or criminal fines, penalties, fees or sanctions; (2) punitive or

exemplary damages, including the multiplied portion any multiple damages; (3)

the return by any Insured of any fees or remuneration paid to any insured; or (4)

any form of non-monetary relief."  (Doc. 50-13 at 31.)

Westport argues that the Diehls' claims for the principal and interest on

their loans seek damages that are in the nature of restitution, not compensatory

damages, and therefore are not "loss."  Westport states that this argument is

supported by Pennsylvania public policy, which prohibits indemnification for the

disgorgement of unlawfully obtained money.   Westport further argues that the

Diehls' malpractice claims against Hanft & Knight are merely a disguised attempt

to recover their principal and interest.  Finally, Westport argues that the Diehls'

claim against Hanft & Knight under the Pennsylvania's Unfair Trade Practices and

Consumer Protection Law seeks a civil penalty that is expressly excluded from the definition of "loss."  The Diehls counter that the underlying complaint seeks both restitution and damages, and that even if some claims do not fit the definition of "loss," others do, thus precluding a denial of coverage.

Where an underlying complaint against the insured raises both covered and non-covered claims, the insurer must defend the entire action until the insurer proves that no underlying claim is covered by the policy.  *See Allen*, 692 A.2d at 1095; *Cadwallader v. New Amsterdam Cas. Co.*, 152 A.2d 484, 488-89 (Pa. 1959). Counts V and VI of the underlying complaint seek damages from Hanft & Knight for the firm's professional malpractice and breach of fiduciary duty.  On their face, these claims seek "loss" within the terms of the policy.  Westport argues that these claims are merely a disguised attempt to recover from the firm what the Diehls may not be able to recover from Hanft personally, but notably, the Diehls could potentially recover both the principal and interest on the loans from Hanft's estate and damages from the firm in the underlying action.  The Diehls professional malpractice claims are thus separate, viable claims that seek compensatory damages, and they therefore fall within the scope of the policy's coverage.

Westport's public policy argument is also unavailing.  Westport relies on *Central Dauphin School District v. American Casualty Co.*, 426 A.2d 94 (Pa.

1981) in arguing that Pennsylvania public policy precludes coverage for any of the underlying claims in this case because indemnification here would allow Hanft (in reality, his estate) to retain ill-gotten gains. In *Central Dauphin*, the school district sought coverage for a court-ordered refund of taxes that had been collected through an unlawful tax measure. The school district's policy defined "loss" in a similar manner as the Westport policy[4], but expressly excluded "matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." The Pennsylvania Supreme Court held that the school district's tax refund was not a "loss" because Pennsylvania public policy would be offended by allowing the school district to realize a windfall from the illegal tax and by giving public entities no incentive to enact only lawful taxing measures. *Id.* at 96.

Subsequent Pennsylvania Supreme Court cases, however, have limited the scope of *Central Dauphin*. In *Hall v. Amica Mutual Insurance Co.*, 648 A.2d 755

---

[4] The policy at issue in *Central Dauphin* defined loss to mean "any amount which the Assured ((including school board members)) or School District are legally obligated to pay, including, but not limited to, any amounts which the School District may be required or permitted to pay as indemnity to an Assured, for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions (excluding from such costs of investigation and defenses, salaries of officers or employees of the School District or any other governmental body) claims or proceedings and appeals therefrom, costs of attachment or similar bonds provided always, however, such subject of loss shall not include fines imposed by the law, or matters which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." *Id.* at 95.

760-61 (Pa. 1994), the Court made it clear that an public policy may be the basis

for altering the terms of a contract only in the "clearest cases."  In *Blast*

*Intermediate Unit 17 v. CNA Insurance Co.*, 674 A.2d 687, 691 (Pa. 1996), the

Court held that public policy did not relieve an insurer from its obligation to

indemnify the insured for losses incurred as the result of the insured's violation of

a federal statute.  In distinguishing *Central Dauphin*, the Court placed significant

reliance on the fact that the insured would not receive a windfall upon

indemnification by the insurer for the financial consequences of the statutory

violation.  *Id.*

In this case, while the Hanft Estate may receive a windfall if Westport

indemnifies a judgment against it, Hanft & Knight would not.  There is no

indication that the firm benefitted from the loans Hanft took from the Diehls, and

indemnification of a judgment requiring the firm to pay compensatory damages to

the Diehls would result in no windfall for Hanft & Knight.  In fact, it appears

beyond peradventure that Hanft burned up the funds received from the Diehls in

advance of his affiliation with Knight, or unbeknownst to Knight if he did so

thereafter.  At least some of the claims in the underlying complaint seek "loss," the

indemnification of which is not barred by public policy, and therefore, these

claims come within the broad coverage provided by the Westport policy.

18

### B.     Whether Policy Exclusions Bar Coverage

Because the underlying action triggers the policy's coverage, Westport

bears the burden of proving that a policy exclusion bars coverage.   *Madison*

*Constr. Co.*, 735 A.2d at 106.   Westport argues that several exclusions preclude

coverage for all of the underlying claims, thereby relieving it of any duty to defend

or indemnify Hanft or the firm.   We will consider these exclusions in turn.

### 1.     Personal Profit Exclusion

Exclusion D of the Westport policy provides that the policy "shall not apply

to any Claim based upon, arising out of, attributable to, or directly or indirectly

resulting from any Insured having gained in fact any personal profit or advantage

to which he or she was not legally entitled."  (Doc. 50-13 at 22.)  For the reasons

that follow, we find that this exclusion bars coverage for the underlying action.

 The underlying complaint alleges that Hanft, an insured under the Westport

policy, induced the Diehls to loan him a large amount of money through

fraudulent representations and abuse of the attorney-client relationship.  (TAC ¶¶

10-11, 21-25, 39.)  The underlying complaint alleges that Hanft used this money to

gamble at casinos and satisfy his gambling debts.  (TAC ¶ 16.)  Finally, the

complaint alleges that the Diehls received nothing of value for their loans, "which

[Hanft] never intended to repay or, in the alternative, believed he could repay only

because of a [sic] unreasonable disregard for the truth that was so reckless as to amount to conscious deception." (TAC ¶ 40.) These allegations clearly demonstrate that Hanft gained personal profit to which he was not legally entitled through the wrongful acts from which the underlying claim arises.

The Diehls argue that this exclusion does not apply for a number of reasons. First, the Diehls claim that the loans made to Hanft were a debt to be repaid, not a profit, and that Hanft did not profit because he was attempting to repay the loans, which were not due in full until a year after his death. The Diehls' argument is belied by their own allegations in the underlying complaint that Hanft "never intended to repay" the loans. (TAC ¶ 41.) Further, the underlying complaint states that, over seven years, Hanft made only a single payment of $10,000 toward the almost $800,000 owed to the Diehls. (TAC ¶¶ 17-18.) The allegations of the underlying complaint show that Hanft took money for personal use with no intention of repaying it. The exclusion therefore bars coverage.

Next, the Diehls argue that the exclusion does not apply because a jury could conclude that Hanft was legally entitled to the loan money but merely committed legal malpractice by failing to properly secure the loans for his clients. Again, we cannot be blind to what the Diehls content in the underlying complaint: that Hanft procured the loans through "fraudulent representations." Because the

20

loans were procured by fraud and misrepresentation, Hanft was not legally entitled

to the funds *ab initio*.

Finally, the Diehls argue that the words "in fact" in the personal profit

exclusion mean that Westport cannot deny coverage on the basis of that exclusion

until the factfinder in the underlying action has not determined "in fact" that Hanft

personally profited.  The Court rejects this interpretation of the exclusion.  The

Diehls cite to several, mostly unpublished, decisions from other jurisdictions in

support of their argument (Doc. 64 at 22-23), but contrary to the Diehls'

contention, these cases do not hold that the "in fact" language requires a final

adjudication in the underlying action.  In each of these cases the court did not

*require* a final adjudication by the underlying factfinder, but rather found that the

allegations and evidence presented was not sufficient to support application of the

exclusion without further underlying proceedings.  *See PMI Mortgage Ins. Co. v.*

*Am. Int'l Specialty Lines Ins. Co.*, No. C 02-1774, 2006 WL 825266 at *7 (N.D.

Cal. Mar. 29, 2006) (holding "that the term 'in fact' within the context of the

exclusion here should be read to require *either* a final adjudication, including a

judicial adjudication, or at a minimum, at least some evidentiary proof"); *Federal*

*Ins. Co. v. Cintas Corp.*, No. 1:04-CV-00697, 2006 WL 1476206 at *7 (S.D. Ohio

May 25, 2006) (holding exclusion did not absolve insurer of duty to defend

because "no factual or legal basis currently exists for applying the Exclusion");

*Am. Chem. Soc'y v. Leadscope, Inc.*, No. 04AP-305, 2005 WL 1220746 at *12

(Ohio Ct. App. May 24, 2005) (holding exclusion inapplicable because "there

remains a question of whether any conversion, in fact, took place"); *St. Paul*

*Mercury Ins. Co. v. Foster*, 268 F. Supp. 2d 1035, 1045 (C.D. Ill. 2003) (holding

exclusion inapplicable because under the facts alleged in the underlying suit, the

insured "could receive personal profits and be legally entitled to retain them" and

distinguishing cases where "there was sufficient evidence in the underlying

complaint to show the profits received were illegal or undeserved within the

meaning of the exclusion").

In this case, the allegations and evidence presented by the underlying

complaint make clear that Hanft procured the loans based on "fraudulent

representations," that the Diehls would not have loaned Hanft the money but for

this fraud, and that Hanft used the loan proceeds for his personal advantage.

(TAC ¶¶ 14-16, 39.)  No party has presented any evidence disputing these

allegations, and, in fact, the Diehls strenuously insist that the Court may consider

nothing beyond these allegations.  Given the undisputed allegations of the

underlying complaint, there is no plausible way that Hanft could be legally entitled

to the personal profit he gained, and therefore, application of the exclusion need

not await final adjudication of the underlying action.

Moreover, it is unlikely that the issue of whether Hanft was "legally entitled" to the loan proceeds will ever be adjudicated in the underlying action.  In the underlying action, the Diehls have asserted causes of action against Hanft for rescission and breach of contract.  Whether Hanft was "legally entitled" to the loan proceeds is not an element of either of these causes of action which the factfinder in the underlying case would be required to determine.  *See Shane v. Hoffmann,* 324 A.2d 532, 536 (Pa. Super. Ct 1974) (holding elements of rescission are 1) a false representation of an existing fact; 2) materiality, if the misrepresentation is innocently made; 3) scienter; 4) justifiable reliance; and 5) damages"); *J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc.,* 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002) ("Three elements are necessary to plead properly a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.").

The Court finds more persuasive and applicable to this case, the interpretation of the "in fact" language found in the Seventh Circuit's decision in *Brown & LaCounte, L.L.P. v. Westport Insurance Corp.*, 307 F.3d 660 (7th Cir. 2002).  There the court rejected the interpretation posited by the Diehls, finding that this approach "makes the exclusion inapplicable to any case because Westport

23

could never use it to exclude a claim until it defended the underlying action." *Id.*

at 663. The Court agrees that the Diehls' interpretation would render the

exclusion meaningless, in contravention of well-established Pennsylvania

principles of policy interpretation. *See, e.g.*, *Mut. of Omaha Ins. Co. v. Bosses*,

237 A.2d 218, 220 (Pa. 1968) ("[T]he cardinal principle of interpretation is that an

insurance policy must be construed in such a manner as to give effect to all of its

provisions. Nor may it be construed in such a way as to render any part of it

useless and unnecessary."). The Diehls' interpretation would effectively write the

exclusion out of the policy, and therefore, it cannot be accepted. The Court can,

and does, find that the undisputed allegations of underlying complaint directly and

unequivocally demonstrate that Hanft gained a personal profit to which he was not

legally entitled. That the Diehls endeavor to disclaim the allegations set forth in

the underlying complaint as a means of saving themselves from an adverse

determination in the case *sub judice* is unavailing. The personal profit exclusion

clearly bars coverage.

### 2.    Prior Knowledge Exclusion

Exclusion B of the Westport policy provides that the policy:

> shall not apply to any Claim based upon, arising out of,
> attributable to, or directly or indirectly resulting from any
> act, error, omission, circumstance or Personal Injury

24

> occurring prior to the effective date of this Policy, if any
> Insured at such effective date knew or could have
> reasonably foreseen that such act, error, omission,
> circumstance, or Personal Injury might be the basis of a
> Claim.

(Doc. 50-13 at 22.)  This exclusion also bars coverage for the underlying action.

Although no Pennsylvania court has directly addressed application of the

prior knowledge exclusion, the Third Circuit has predicted that the Pennsylvania

Supreme Court would apply a mixed subjective/objective standard to determine

whether claims were excluded from coverage under this provision:

> First, it must be shown that the insured knew of certain
> facts.    Second, in order to determine whether the
> knowledge actually possessed by the insured was sufficient
> to create a basis to believe, it must be determined that a
> reasonable lawyer in possession of such facts would have
> had a basis to believe that the insured had breached a
> professional duty.

*Selko v. Home Ins. Co.*, 139 F.3d 146, 152 (3d Cir. 1998); *see also Coregis Ins.*

*Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 306 (3d Cir. 2001) (applying *Selko*

test to exclusion identical to Exclusion B of the Westport policy).

In this case, by the December 31, 2003 effective date of the Westport policy,

Hanft certainly knew of certain material facts that relate to this exclusion.  By that

date, Hanft had already secured all three loans from the Diehls (TAC ¶¶ 10, 52,

64) through fraudulent representations, including misrepresentations about

25

illusory collateral (TAC ¶¶ 13-15, 39), and had used this money to gamble and satisfy gambling debts (TAC ¶ 16).  Hanft had also prepared a promissory note to evidence his debt to the Diehls, which Hanft secured through fraudulent representations, never intended to repay, and failed to adequately secure.  (TAC ¶¶ 19, 21-23, 39-40.)  Finally, before the inception of the policy, Hanft had made only a single payment of $10,000 toward the hundreds of thousands of dollars he by then had borrowed from the Diehls.  (TAC ¶ 17.)

These facts – inducing loans through fraud, taking loans from clients without properly advising them and with no intention of repaying them, drafting illusory promissory notes, and failing to make payments of substantial debt – would undoubtedly provide any reasonable attorney, and in fact any reasonable person, with a basis to believe that he had breached his professional duty.

The Diehls attempt to argue that the exclusion does not apply here because there are "fact issues" as to whether Hanft intended and had the ability to repay the loans.  Again, however, this argument ignores entirely the Diehls' own allegation in the underlying complaint that Hanft never intended to repay the loans.  (TAC ¶ 40.)  Further, even if Hanft had repaid the loans in the time between his death and the February 1, 2005 maturity date of the promissory note, he would *still* have a basis to believe he had breached a professional duty by fraudulently inducing his

clients to make the loans in the first place, failing to make them aware of the risks of such loans, and by failing to properly secure this debt.  (*See* TAC ¶¶ 21-23, 39.)

The Diehls also argue that Hanft's acts were not so "glaring" or "blatant" as to induce them to complain to Hanft prior the inception of the policy.  As an initial matter, it is *Hanft's* subjective knowledge that is relevant to the *Selko* analysis, not the *Diehls'*.  Regardless, the Diehls' contention is again belied by their allegations in the underlying action.  The Diehls were evidently unhappy or uncomfortable enough with Hanft, after six years of failing to make payments on the loans, that they had Hanft prepare the 2003 promissory note.  (TAC ¶¶ 18-23.)  Further, the Diehls learned that Hanft's representations which induced them to make the loans were false "only days before his death," and therefore, would not have had reason to complain about Hanft's behavior before that time.  (TAC ¶ 16.)  Finally, and as stated previously, the allegations of the underlying complaint make it abundantly clear that Hanft's actions were, in fact, so "glaring" and "blatant" as to give any reasonable lawyer a basis to foresee a malpractice claim.

Lastly, the Diehls argue that Westport may not be able to raise the prior knowledge exclusion as a bar to coverage because Westport has not entered into evidence the policy application in which Hanft may have disclosed the acts that he reasonably foresaw leading to a claim.  This argument is also unavailing.  First, the

27

Diehls' assertion that Hanft may have disclosed prior acts on the application is completely unsupported, and their mere speculation does not raise a genuine issue of material fact precluding summary judgment. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) ("Rule 56(e) does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions.").  Further, no reasonable juror could conclude that any insurer would extend coverage to Hanft after he disclosed that he had fraudulently induced clients to lend him money, gambled away the proceeds, and had no intention of repaying the loans.  The only logical conclusion is that if Hanft had made a full disclosure on the policy application, there would have been no policy. Moreover, regardless of what was disclosed, the prior knowledge exclusion operates to bar coverage independent of any policy application.  Westport is not seeking to rescind or void the policy based on misrepresentations or non-disclosures in the application.  *See, e.g.*, *Harristown Dev. Corp. v. Int'l Ins. Co.*, No. 87-1380, 1988 WL 123149 at *3-5 (M.D. Pa. Nov. 15, 1988).  Rather, pursuant to the plain language of the subject exclusion, Westport seeks to exclude coverage for claims arising out of acts occurring prior to the effective date of the policy which any insured could have reasonably foreseen might be the basis of a claim, regardless of whether those acts were disclosed on an application.  The very

authority cited by the Diehls refutes their argument and explains that an insurer

need not show that it was prejudiced by an insured's non-disclosure before

invoking the prior knowledge exclusion. *Ehrgood v. Coregis Ins. Co.*, 59 F. Supp.

2d 438, 444-45 (M.D. Pa. 1998).

The allegations of the underlying complaint make it clear that Hanft knew

of facts which would lead any reasonable lawyer to foresee that such acts might be

the basis of a claim. Coverage for the underlying complaint is therefore excluded

by the prior knowledge exclusion.

### 3.    Dishonesty Exclusion

Exclusion A of the Westport policy provides that the policy:

> shall not apply to any Claim based upon, arising out of,
> attributable to, or directly or indirectly resulting from any
> criminal, dishonest, malicious or fraudulent act, error,
> omission or Personal Injury committed by an Insured. This
> exclusion does not apply to any Insured who is not so
> adjudged.

(Doc. 50-13 at 22.) Although undefined by the policy, the common terms of this

exclusion are given their ordinary meaning. *Madison Constr. Co.*, 735 A.2d at 108

("Words of common usage in an insurance policy are to be construed in their

natural, plain, and ordinary sense, and we may inform our understanding of these

terms by considering their dictionary definitions."). Merriam-Webster's

29

Collegiate Dictionary, 11th Edition (2003), defines "dishonest" as "characterized by lack of truth, honesty, or trustworthiness."  Similarly, the American Heritage Dictionary of the English Language, Fourth Edition (2004), defines "dishonest" as "disposed to lie, cheat, defraud, or deceive."  The allegations of the underlying complaint – that Hanft unfairly took advantage of the Diehls by deceiving them into lending money through false representations – clearly arise from "dishonest" acts.  Therefore this exclusion also bars coverage for the underlying action.

The Diehls argue that the underlying complaint alleges that Hanft committed fraudulent and dishonest acts only in the alternative and that a jury could conclude that Hanft was merely negligent.  However, in paragraphs of the complaint that are incorporated into every underlying count, the Diehls allege that Hanft "took unfair advantage of [them]" (TAC ¶ 10), made false representations to induce them to lend money (*Id.* at ¶¶ 13-16), "engaged in improper self-dealing, abused the relationship of trust and confidence that he had with his clients and otherwise failed to conduct himself in accordance with acceptable professional standards" (*Id.* at ¶ 22), and "breach[ed] his professional obligations to his clients with respect to each and every loan" (*Id.* at 23).  Based on these allegations, no reasonable jury could conclude that Hanft was negligent, but not dishonest.

Similar to their argument regarding the "in fact" language of the personal profit exclusion, the Diehls argue that the "so adjudged" language of the dishonesty exclusion precludes application of the exclusion until any insured is adjudged in the underlying action to have committed a criminal, dishonest, malicious or fraudulent act.  The Court rejects this argument for the reasons stated above.  First, the undisputed allegations of the underlying complaint make it overwhelmingly clear that Hanft committed dishonest acts.  In fact, if the Diehls are successful in their cause of action for rescission, they will have to prove that Hanft committed fraud, necessarily bringing the underlying complaint within this exclusion.  Next, to require Westport to defend any action to a final adjudication before applying the exclusion would effectively write this provision out of the policy.  Finally, although the Diehls' claims clearly arise from "dishonest" acts within the plain meaning of the exclusion, the underlying jury could fashion a verdict that fails to adjudge them so.  It is entirely appropriate then for us to characterize Hanft's acts not only as they are described by the Diehls in the underlying complaint, but also as what they clearly are – the disreputable and dishonest behavior of a lawyer gone bad.  For these reasons, application of the exclusion need not await adjudication of the underlying action.

### 4.    Conversion/Misappropriation Exclusion

Exclusion H of the Lawyers Professional Liability Coverage Unit provides that the coverage part does not apply to "any Claim based upon, arising out of, attributable to, or directly or indirectly resulting from any conversion, misappropriation or improper commingling of client funds.  This exclusion does not apply to any Insured who is not so adjudged."  (Doc. 50-13 at 28-29.)  It is undisputed, at least for the purposes of these motions, that the loans at issue involve "client funds."  (*See* TAC ¶¶ 8, 21, 23.)  The terms conversion, misappropriation, and commingling are not defined in the policy.  Where a policy uses technical terms, those words are construed in their technical sense unless a contrary intention clearly appears.  *Blue Anchor Overall Co. v. Pa. Lumbermens Mut. Ins. Co.*, 123 A.2d 413, 415 (1956).

Under Pennsylvania law, "[a] conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964).  Money may be the subject of conversion.  *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. Ct. 2003) (citing *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 878 (Pa. Super. Ct. 1997)).  The Diehls note that "the

failure to pay a debt is not conversion," *id.*, and argue that Hanft did not convert

their money because they consented to the loans.  The underlying complaint,

however, alleges much more than a simple failure to pay a debt.  The Diehls allege

that Hanft "took unfair advantage of [them]" (TAC ¶ 10), by inducing them to lend

money through false representations (*Id.* at ¶¶ 13-16), and that Hanft "breach[ed]

his professional obligations to his clients with respect to each and every loan" (*Id.*

at 23).  Moreover, the Diehls' consent is vitiated here because it was obtained by

misrepresentation.  *See Chandler v. Cook*, 265 A.2d 794, 795 (Pa. 1970);

*Levenson v. Souser*, 557 A.2d 1081, 1091 (Pa. Super. Ct. 1989) (quoting *Prosser*

*and Keeton on Torts* (5th ed. 1984), "Where there is active misrepresent-ation, this

has been held to invalidate the consent").  Hanft deprived the Diehls of their

money without lawful justification and with fraudulently obtained consent.  The

underlying claims therefore arise out of Hanft's conversion of the Diehls' funds.

Further, the conduct alleged in the underlying complaint falls within the

meaning of "misappropriation."  Black's Law Dictionary (8th ed. 2004) defines

misappropriation as "[t]he application of another's property or money dishonestly

to one's own use."  In the context of the common law tort involving the unfair use

of another's information or ideas, the Pennsylvania Superior Court has noted that

the elements of misappropriation are "(1) the plaintiff has made a substantial

investment of time, effort and money into creating the thing misappropriated such that the court can characterize that 'thing' as a kind of property right, (2) the defendant "has appropriated the 'thing' at little or no cost, such that the court can characterize defendant's actions as 'reaping where it has not sown,' and (3) the defendant has injured plaintiff by the misappropriation." *Sorbee Int'l Ltd. v. Chubb Custom Ins. Co.*, 735 A.2d 712, 716 (Pa. Super. Ct. 1999) (quoting *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal. App. 4th 548, 561 (1996)). In this case, Hanft unfairly appropriated the Diehls' money, at almost no cost to himself and with only illusory collateral. (TAC ¶¶ 10, 13-17.) As discussed above, Hanft's actions were unquestionably dishonest. *See supra* at 29-30. Hanft took the Diehls' money for his own personal use (TAC ¶ 16), and the Diehls' were clearly damaged by his actions (TAC ¶¶ 42, 49-50, 62, 73, 78, 85, 94-95). The claims of the underlying complaint are based upon Hanft's misappropriation of his clients' funds, and therefore, the conversion/misappropriation exclusion applies to bar coverage.

Again the Diehls argue that the "so adjudged" language of the exclusion precludes it application until any insured is adjudged in the underlying action to have converted, misappropriated, or commingled client funds. The Court again rejects this argument for the reasons stated above. *See supra* at 21-24, 30-31.

### C.      Whether Hanft & Knight Is an Innocent Insured

Finally, the Diehls argue that, even if their underlying claims against Hanft are excluded from coverage, their claims against Hanft & Knight are still potentially covered by the Westport policy because the firm is an innocent co-insured.  Westport counters, first, that Hanft's actions are imputed to the Hanft & Knight because he was one of two principals of the firm and owned 75% of the corporation.  Second, Westport counters that the language of the personal profit and prior knowledge exclusions bar coverage for innocent insureds.

Initially, it is noted that the Westport policy does not contain any explicit provision preserving coverage for innocent insureds.  Westport concedes, however, that innocent insured coverage could be found without such a provision, just not on the facts of this case or under the terms of the exclusions at issue here.

The Court agrees that the unambiguous language of the personal profit and prior knowledge exclusions bar coverage for Hanft & Knight.  The personal profit exclusion provides that the policy "shall not apply to any Claim based upon, arising out of, attributable to, or directly or indirectly resulting from **any Insured** having gained in fact any personal profit or advantage to which he or she was not legally entitled."  (Doc. 50-13 at 22 [emphasis added].)  Similarly, the prior knowledge exclusion provides that the policy "shall not apply to any Claim based

35

upon, arising out of, attributable to, or directly or indirectly resulting from any act, error, omission, circumstance or Personal Injury occurring prior to the effective date of this Policy, if **any Insured** at such effective date knew or could have reasonably foreseen that such act, error, omission, circumstance, or Personal Injury might be the basis of a Claim." (*Id.*) Pennsylvania law is clear that the use of the term "any insured" in these exclusions, rather than "the insured," bars coverage for innocent co-insureds.

The Pennsylvania Superior Court recently illustrated this distinction in *Donegal Mutual Insurance Co. v. Baumhammers*, 893 A.2d 797 (Pa. Super. Ct. 2006).[5] In that case, a son went on a shooting spree, killing five people and seriously injuring another. The shooting victims and their families brought suit against the son's parents, alleging that the parents' negligence led to the son's intentional and criminal acts. At issue were two insurance policies issued to the parents, under which both the parents and son were insureds. The policy issued by Donegal Mutual Insurance Company provided coverage for bodily injury caused

---

[5] Appeal was granted in *Baumhammers* by the Pennsylvania Supreme Court, *see* 908 A.2d 265 (Pa. 2006), and as of the date of this memorandum, the case remains pending. The Court, however, finds persuasive the *Baumhammers* court's analysis of the innocent insured provision and its review of other Pennsylvania caselaw on this issue, and further finds that this analysis is confirmed by federal courts addressing the same issue under Pennsylvania law. *See, e.g.*, *Spezialetti v. Pac. Employers Ins. Co.*, 759 F.2d 1139, 1142 (3d Cir. 1985); *Ehrgood*, 59 F. Supp. 2d at 445.

by an "occurrence," which was defined as an "accident," and excluded coverage for bodily injury expected or intended by "the insured."  The policy issued by United Services Automobile Association also provided coverage for an "occurrence," defined as an "accident," but excluded coverage for bodily injury caused by the intentional or criminal acts of "any insured."

After an extensive review of Pennsylvania caselaw, the court held that Donegal had a duty to defend and potentially indemnify the negligence claims against the parents, even though the underlying allegations involved the intentional acts of another insured.  *Id.* at 806-810.  On the other hand, the court held that the "any insured" language of the USAA policy precluded coverage for the parents under that policy, rejecting the parents' claim that the exclusions barred coverage only for the son because only he had committed intentional or criminal acts.  *Id.* at 818-19.  The court stated "[t]he fact that Parents did not engage in criminal behavior is immaterial because the USAA policy exclusion applies to criminal behavior of *any* insured....  In light of the clear an unambiguous wording of the present exclusion... we will not hesitate to enforce it."  *Id.* (emphasis in original and citing *McAllister v. Millville Mut. Ins. Co.*, 640 A.2d 1283 (Pa. Super. Ct. 1994)).

Similarly in this case, the personal profit and prior knowledge exclusions of the Westport policy bar coverage if "any insured" commits acts which fall within their terms.  As discussed above, these exclusions preclude coverage for claims arising from Hanft's conduct as alleged in the underlying complaint, and therefore, bar coverage for the underlying claims against Hanft & Knight.

## IV.   CONCLUSION

For the foregoing reasons, Westport has no duty to defend or indemnify the Estate of Michael J. Hanft or Hanft & Knight, P.C. under policy number PLL-351215-1 with regard to claims asserted by the Diehls in the action captioned *Raymond E. Diehl and Genevieve A. Diehl v. Hanft & Knight, P.C., Susan A. Hanft, individually and in her fiduciary capacity as personal representative of the Estate of Michael J. Hanft, deceased*, Case No. 04-4541, in the Court of Common Pleas of Cumberland County, Pennsylvania.  An appropriate order shall issue.